# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

OMINOBA EGEI,

       *Plaintiff*,

   v.

JEH C. JOHNSON, *Secretary of Homeland Security*,

       *Defendant*.

Civil Action No. 15-434 (RDM)

## MEMORANDUM OPINION

This Title VII retaliation action turns on whether an employer may lawfully fire an employee for making false or malicious accusations during the course of Equal Employment Opportunity ("EEO") proceedings. The plaintiff, Ominoba Egei, alleged in 2009 that she had been sexually harassed by a supervisor while working at the Federal Emergency Management Agency ("FEMA"). When Egei brought an administrative complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, she submitted written and oral testimony under oath making the same allegations. The administrative law judge found that Egei's allegations were not credible, and rejected her claim. A year and a half later, FEMA terminated Egei's employment on the ground that she had lied in the course of the EEO proceeding that she had initiated in 2009. Egei then brought a second EEO complaint, and now this action, alleging that her termination was retaliatory.

The case is now before the Court on FEMA's motion to dismiss or, in the alternative, for summary judgment. Dkt. 9. Because the Court concludes that Title VII's participation clause protects an employee from adverse employment action taken on the basis of the substance of her

testimony in a Title VII EEO proceeding, it will deny FEMA's motion and will grant partial summary judgment—limited to the question of liability—to Egei.  The question of remedy, however, remains, and will require further proceedings.

## I. BACKGROUND

**A.** *Egei I*

Egei was hired by FEMA in August 2007 as a disaster assistance employee, a temporary position for workers who could be deployed quickly and temporarily to disaster areas.  *See* Dkt. 9-2 at 1 (Def.'s Statement of Material Facts ("SMF") ¶ 1).  In September 2008, Egei was sent to Houston, Texas, to work as a community relations specialist in the wake of Hurricane Ike.  Dkt. 9-4 at 3 (Def.'s Mot. Summ. J., Ex. A) ("ALJ Decision").  Her supervisor in Houston was Jean Jacques Fequiere.  *Id.*  According to FEMA, Egei's tenure in Houston was a turbulent one.  She was initially assigned to work with Pamela Stevenson, another FEMA employee, but Stevenson asked for a new partner after only two days, explaining that she could not work with Egei, whom she found "very demanding and rude."  *See* Dkt. 9-5 at 176–78 (Def.'s Mot. Summ. J., Ex. B, at 175–77) (Hearing Transcript ("Hr'g Tr.")).  Beverly Winder, Egei's second partner, also testified that Egei was difficult to work with, citing her "unusual behavior" and "lack of professionalism." *Id.* at 147–49 (Hr'g Tr. 146–48).

Near the end of her time in Houston, in mid-October, Egei alleges that she was sexually harassed by Fequiere.  Egei alleges that, on or around October 16, Fequiere asked her to remain in his hotel room after her fellow FEMA workers had left, and then suggested that she return in the evening to give him a massage.  *See* Dkt. 9-7 at 8 (Def.'s Mot. Summ. J., Ex. D, at 8) ("Egei Interrog.").  The next day, she alleges, Fequiere called her in the evening and asked her to come to his hotel in order to run an errand.  *Id.* at 7.  According to Egei, however, when she arrived at

2

his room, he emerged from his bathroom "half naked" and asked her to shower with him. *Id.* at 7–8. When he refused, she claims, he threatened to terminate her, saying, "You might be going home." *Id.* at 8. When she continued to refuse Fequiere's advances, he allegedly instructed her to take him to a strip club. *Id.* at 8–9. Ultimately, Egei claims, she drove Fequiere to a nearby print shop, where he obtained directions first to a strip club and then to a nightclub. *Id.* at 9–10. Egei alleges she drove Fequiere to the nightclub, which was closed, then to a local Wal-Mart, and finally back to his hotel, where she left him without incident. *Id.* at 10.

Sometime between October 18 and 20, Egei was told that she would be "right-sized," or sent home from Houston to await another assignment.[1] *See* Dkt. 9-5 at 55 (Hr'g Tr. 55) (Egei's testimony) (identifying date as October 18); *id.* at 199 (Hr'g Tr. 198) (John Aker's testimony) (identifying date decision was made as October 18 and date of "right-siz[ing]" as October 20); *id.* at 257 (Hr'g Tr. 256) (Fequiere's testimony) (stating that he received an e-mail from Aker regarding Egei's right-sizing on October 18 and put the e-mail in Egei's "folder"). On or after that date, Egei reported the alleged harassment to the wife of Fequiere's supervisor, John Aker. *Id.* at 200 (Hr'g Tr. 199) (Aker's testimony) (reporting that Egei contacted his wife on Sunday, October 20); *id.* at 53–55 (Hr'g Tr. 53–55) (Egei's testimony) (testifying that she called Aker's wife the morning after the incident, which she agreed would have been October 18). Egei does

---

[1] Although disaster assistance employees are "carried on FEMA personnel rolls for a 24- month period" and are "automatically reappointed at the end of each appointment period," they work (and are paid) only when they are "activated" for specific assignments. *See* Dkt. 9-10 at 4–6 (Def.'s Mot. Summ. J., Ex. G) ("FEMA Instruction 8600.1"). The process of *de*activating a disaster assistance employee—*i.e.*, sending her home and making her available to be re- deployed—is commonly known as "right-sizing." *See* Dkt. 9-5 at 203–04 (Hr'g Tr. 202–03). Although the disaster assistance employee program was modified in 2012, *see* Dkt. 9-1 at 4, the policies regarding the program remain "applicable to Disaster Assistance Employees" who, like Egei, were "appointed prior to" June 14, 2012, *see* FEMA Directive 010-6, *FEMA Reservist Program* (June 14, 2012), http://1.usa.gov/21Sadf7.

not contest that she did not report the incident until after she learned she was being right-sized. *Id.* at 55–56 (Hr'g Tr. 55–56).

The following month, Egei filed a formal complaint against FEMA under Title VII of the Civil Rights Act of 1964. *See* Dkt. 9-13 at 1 (Def.'s Mot. Summ. J., Ex. J). Egei alleged that she had been subjected to discrimination on the basis of her sex and national origin—and specifically that she had been harassed by Fequiere and then terminated because she refused to have sex with him. *Id.* at 1–2. Egei requested a formal hearing on her complaint before an Equal Employment Opportunity Commission ("EEOC") administrative law judge ("ALJ"), and the EEOC held such a hearing on July 27, 2010. *See* Dkt. 9-5 (Hr'g Tr.).

At the hearing, Egei's testimony regarding the incident differed in several ways from the account she had previously provided. Most significantly, although Egei had stated in her formal complaint and in response to interrogatories that Fequiere had attempted to have sex with her on October 17, 2008, FEMA's counsel impeached her with a government travel voucher showing that she had picked up a rental car from the airport that evening during the timeframe in which she alleged she was with Fequiere. *See id.* at 120–23 (Hr'g Tr. 119–22). Egei's testimony also varied from her prior statements in other ways. Although she had stated during a deposition that Fequiere had walked out of his hotel bathroom naked, she testified at the hearing that Fequiere had in fact been "half naked." *See id.* at 92–93 (Hr'g Tr. 92–93). And although Egei had not previously made allegations about Fequiere's conduct before October 16, she testified during the hearing that Fequiere had made sexual advances as early as October 6 or 7. *Id.* at 28–29 (Hr'g Tr. 28–29).

FEMA's counsel argued that these discrepancies, taken together, established that Egei had "willfully mis[led] the [C]ommission[] with false testimony," and requested "sanctions from

4

the EEOC for this fraud." *Id.* at 20 (Hr'g Tr. 20) (opening statement); *see also id.* at 123 (Hr'g Tr. 122); *id.* at 321–22 (Hr'g Tr. 320) (closing statement) ("What this case comes down to is a complete fabrication."). Although the ALJ did not grant FEMA's request for sanctions, she did deny Egei's complaint in a 12-page decision on September 1, 2010. *See* Dkt. 9-4 (ALJ Decision). The ALJ relied substantially on the discrepancies between the testimony Egei presented at the hearing and her prior statements. *See id.* at 7–9. She reasoned that FEMA's documentary evidence was "very powerful," adding that "[a]s soon as [Egei] was aware of the evidence she changed her testimony." *Id.* at 8. She also reasoned that "the timing of the report of the incident" suggested that Egei might have raised the charges in order to keep her job. *Id.* at 9.[2]

The ALJ's decision ended with three "conclusions of law": (1) Egei "did not show prima facie cases of national origin, race, sex, or sexual harassment"; (2) the government "showed that the alleged events did not occur"; and that (3) Egei "did not show that any of the alleged events occurred because of prohibited reasons." *Id.* at 10. FEMA issued a final decision on September 15, 2010, adopting the ALJ's decision in full. *See* Dkt. 9-15 at 1–2 (Def.'s Mot. Summ. J., Ex. L). Egei did not appeal that decision to the EEOC.

**B.    The Present Case**

The present case arises not out of FEMA's denial of Egei's first EEO complaint but out of its subsequent decision to terminate her employment. On February 15, 2012, about a year and a half after the ALJ's decision, Egei was told that she would be terminated from her "temporary

---

[2] The ALJ also reasoned that the events that formed the basis for Egei's national-origin and sex discrimination claims (as opposed to her sexual harassment claim), even taken as true, "failed to show harassment." *See id.* at 7. Because the current action does not turn on the merits of Egei's national-origin and sex discrimination claims, the Court focuses primarily on her sexual harassment claim.

5

appointment as a Disaster Reservist with" FEMA. Dkt. 9-6 at 1 (Def.'s Mot. Summ. J., Ex. C) ("Termination Notice"). The notice, which was signed by Ronald Wells, the acting chief of FEMA's Readiness Unit, listed three grounds for the termination: (1) falsification of records, (2) lack of candor, and (3) failure to comply with the conditions of her employment. *Id.* The notice specified that Egei was being terminated on the basis of the allegations she had made in her 2008 EEO complaint and her sworn testimony before the EEOC ALJ. *See id.* at 1–2. It detailed the allegations Egei had made and summarized the ALJ's decision in the case. *Id.* at 2. The notice ended: "The falsification of records, inaccurate statements and lack of candor is unacceptable behavior which will not be tolerated or condoned." *Id.*

On April 12, 2012, Egei filed a second EEO complaint against FEMA, alleging that she had been retaliated against on the basis of her prior participation in EEO proceedings. Dkt. 9-16 at 1 (Def.'s Mot. Summ. J., Ex. M). Egei initially requested a second EEOC hearing, but later withdrew her request. Dkt. 9-18 at 1 (Def.'s Mot. Summ. J., Ex. O). FEMA issued its decision denying her complaint on May 17, 2014. Dkt. 9-19 at 1 (Def.'s Mot. Summ. J., Ex. P) ("FEMA Decision"). The decision, issued by an employee in FEMA's Office for Civil Rights and Civil Liberties, explained that although Egei maintained that her original allegations were truthful, she had "failed to provide any evidence" to rebut the ALJ's finding that she had not been harassed during her Houston deployment. *Id.* at 5–6. The agency further reasoned that Egei had

> failed to produce sufficient evidence to corroborate her position that the Agency's decision to terminate her was pretextual. The record is devoid of any persuasive evidence that unlawful animus was a factor in the Agency's actions; rather, the record shows that [Egei's] "lack of candor" and her failure to "maintain high standards of integrity [and] conduct" were the reasons for her removal. The preponderance of the evidence of record supports the Agency's decision. Ultimately, Complainant failed to prove FEMA discriminated against her because of her prior EEO activity.

*Id.* at 6.

6

Egei filed this action *pro se* on August 8, 2014. Dkt. 1. In her complaint, she alleges that she had been retaliated against on the basis of her participation in EEO proceedings, in violation of Title VII of the Civil Rights Act of 1964. *Id.* at 4. She also accuses FEMA of "defaming her reputation" and argued that "the sexual harassment did occur." *Id.* at 3. FEMA filed a motion to dismiss or, in the alternative, for summary judgment on July 24, 2015. Dkt. 9. On September 9, 2015, Egei obtained counsel, and her counsel filed an opposition to FEMA's motion. Dkt. 14. On March 10, 2016, the Court ordered supplemental briefing on (1) "[w]hether, as a matter of law, an employee may be subject to an adverse employment action on the basis of false or malicious statements made during the course of equal employment proceedings"; (2) whether, if so, such an employee may be subject to such an action "on the basis of *the employer's reasonable belief* that her statements were made falsely or maliciously"; and (3) whether, if not, judgment should be entered for Egei. Dkt. 18 at 1–2. The parties filed supplemental briefs on March 25, 2016. Dkts. 19, 20.

## II. DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). This case turns on the proper interpretation of this antiretaliation provision, which the parties read in dramatically different ways.[3]

---

[3] Egei's *pro se* complaint also contained allegations that appeared to (a) challenge FEMA's final decision in her original EEO proceeding and (b) allege that various statements made by FEMA were defamatory. Compl. ¶ 15. FEMA briefed these issues in its motion. *See* Dkt. 9-1 at 15–17. In her counseled opposition, however, Egei disavowed any intent to pursue these claims, Dkt. 14 at 1–2, and so the Court will not consider them here.

7

Egei's argument is straightforward. She contends that she was terminated on the basis of her 2008 EEO charge and the testimony she provided in its support. Because Title VII prohibits an employer from taking adverse employment action "because [an employee] has made a charge [or] testified" in an EEO proceeding, she argues, FEMA has violated Title VII. FEMA advances a different understanding of the antiretaliation provision. The agency argues that it did not terminate Egei because she "made a charge" or "testified" in an EEO proceeding; it terminated her because she lied during that EEO proceeding. In FEMA's view, although an employer may not terminate or discipline an employee on the basis of her *participation* in EEO proceedings, it may terminate or discipline her for *making false or malicious statements* in the course of those proceedings. Because Title VII does not bar an employer "from taking action where an employee flagrantly abuses the EEO process . . . by concocting a malicious, false story," FEMA argues, Dkt. 19 at 1, it did not violate Title VII when it fired Egei in 2012.

FEMA makes a number of variants on this argument. *See* Dkt. 9-1 at 18–24 (arguing that the facts and circumstances surrounding Egei's termination defeat any inference that it fired her on the basis of her participation in EEO proceedings rather than the accusations she made during those proceedings); *id.* at 24–25 (arguing that, even if Egei's accusations were not false, FEMA honestly and reasonably believed that they were). But they all turn on a single question of law: May an employer lawfully terminate an employee on the basis of false or malicious statements made during EEO proceedings? This question has divided the courts of appeals. *Compare, e.g.*, *Glover v. S.C. Law Enf't Div.*, 170 F.3d 411, 414–15 (4th Cir. 1999) (holding that an employee may not be terminated on the basis of statements made during an EEO proceeding), *and Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998, 1007 (5th Cir. 1969) (same), *with Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890–91 (7th Cir. 2004) (holding that she may be). The D.C.

8

Circuit has not resolved the issue, but has observed in dicta that "[t]he participation clause speaks in clear, *absolute terms*, and has accordingly been interpreted as shielding recourse to the EEOC, regardless of the ultimate resolution of the underlying claim on its merits." *See Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981) (emphasis added).

For the reasons set out below, the Court concludes, consistent with this dicta and with the majority of courts to have considered the question, that Title VII protects a claimant who is later terminated on the basis of the substance of testimony or claims she makes in the course of Title VII EEO proceedings. Because FEMA concedes that Egei was terminated on the basis of such statements, the Court will deny FEMA's motion for summary judgment and will instead enter partial summary judgment, limited to the question of liability, for Egei.

**A.     The Circuit Split**

Title VII's antiretaliation provision prohibits an employer from taking action against an employee because she has either (1) "opposed any practice" prohibited by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" governed by Title VII. 42 U.S.C. § 2000e-3(a). These two clauses are known as the "opposition" clause and the "participation" clause, respectively. *Parker*, 652 F.2d at 1019; *see also* 1 Barbara T. Lindemann et al., *Employment Discrimination Law* 15-3 (5th ed. 2012). The parties agree that Egei's retaliation claim is brought under the "participation" clause, because the statements that FEMA alleges were false or malicious were made in her formal EEO charge and her testimony before the EEOC ALJ. *See* Dkt. 19 at 6; Dkt. 20 at 10. The question is whether the participation clause shields an employee from adverse action on the basis of *any* testimony she provides in an EEO proceeding, as some courts have concluded, or whether the privilege established by the clause is, as other courts have concluded, a qualified one.

9

The leading case recognizing an absolute privilege is *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998. In *Pettway*, an African-American metalworker brought an EEOC complaint against his employer for suspending him on the basis of his race. *See id.* at 1000–01. When the EEOC dismissed the charge, the plaintiff filed a letter requesting reconsideration, in which he alleged that (among other things) the EEOC investigator had been bribed. *Id.* at 1001–02 & n.5. In response, the employer discharged the plaintiff "for making false and malicious statements about [the e]mployer in the letter." *Id.* at 1002. The plaintiff filed another complaint with the EEOC, and then a Title VII action, claiming that he had been retaliated against on the basis of his participation in EEO proceedings. *Id.* The district court dismissed the case, "ruling that the letter constituted serious, false charges and was not privileged" under Title VII. *Id.*

The Fifth Circuit reversed. *Id.* at 1007. It explained that Title VII's protections against retaliation were designed "to protect the employee who utilizes the tools provided by Congress to protect his rights"—a goal that would be "frustrated if the employer may unilaterally determine the truth or falsity of charges and take independent action." *Id.* at 1005. *See also Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) ("If the availability of . . . protection [under the participation clause] were to turn on whether the employee's charge were ultimately found to be meritorious, resort to the remedies provided by the Act would be severely chilled." (citing *Pettway*, 411 F.2d at 1004–07)). Although the Fifth Circuit reasoned that an employee who filed a facially invalid EEO complaint might not be protected by the participation clause, where an EEO complaint was facially valid but contained false or malicious statements, "the charging party is exercising a protected right under the Act" and "may not be discharged" on the basis of having done so. *Pettway*, 411 F.2d at 1007. Because the employee in that case had filed

10

just such a charge, the Fifth Circuit concluded that his discharge was in violation of Title VII. *Id.*

In the 45 years since the *Pettway* decision, many circuits have restated the *Pettway* rule with varying degrees of approval. Most notably, the Fourth Circuit has adopted the rule in full. In a 1999 opinion authored by then-Chief Judge Wilkinson, it held that "*all* testimony in a Title VII proceeding is protected against punitive employer action." *Glover*, 170 F.3d at 414 (emphasis added). The Fourth Circuit reasoned that "[t]he plain language of the participation clause itself foreclose[d]" a limited interpretation of its scope. *Id.* As the court explained, "[t]he word 'testified' is not proceeded or followed by any restrictive language that limits its reach"; indeed, "it is followed by the phrase 'in any manner'—a clear signal that the provision is meant to sweep broadly." *Id.* (internal quotation marks omitted). Moreover, as the Fourth Circuit further explained, a broad interpretation is consistent with the purpose of Title VII. It wrote:

> Section 704(a)'s protections ensure not only that employers cannot intimidate their employees into for[]going the Title VII grievance process, but also that investigators will have access to the unchilled testimony of witnesses. . . . If a witness in a Title VII proceeding were secure from retaliation only when her testimony met some slippery reasonableness standard, she would surely be less than forthcoming. It follows that the application *vel non* of the participation clause should not turn on the substance of the testimony.

*Id.*

Most other circuits have cited *Pettway* favorably or have referenced its holding in dicta. Some, like the D.C. Circuit in *Parker*, have stated the *Pettway* rule, or a form of it, but have held that it does not apply to claims brought under Title VII's "opposition" clause (as opposed to its participation clause). *See, e.g.*, *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1175 (11th Cir. 2000); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). Others have cited favorably to *Pettway* in reading the participation clause expansively—stating,

11

for instance, that protection afforded by the participation clause is "broad" or that it applies even if the employee's charge is found not to have merit. *See Slagle v. Cty. of Clarion*, 435 F.3d 262, 266, 268 (3d Cir. 2006); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999); *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994) (per curiam).

The Seventh Circuit, by contrast, has repeatedly rejected the *Pettway* rule. In a 2004 opinion by then-Chief Judge Flaum, the Seventh Circuit held that only a "good faith" and "reasonable" EEO complaint warrants protection under the participation clause. *Mattson*, 359 F.3d at 892. It explained that, were it to hold otherwise, "an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint with a government agency." *Id.* at 891. Such a rule, it reasoned, "would encourage the abuse of Title VII and the proceedings that it establishes." *Id.* In a later opinion, Judge Posner expressed a similar view in dicta, arguing that the panels in *Pettway* and similar cases "can't actually *believe* that forging documents and coercing witnesses to give false testimony are protected conduct," and that there was no real difference between such conduct and lying. *See Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 746 (7th Cir. 2010).[4]

Thus, in two circuits—the Fourth and the Fifth—an employee who makes even a false or malicious statement in an EEO proceeding cannot be fired on the basis of the statement. Under such a rule, FEMA would have violated Title VII in firing Egei. In the Seventh Circuit, by contrast, an employee who makes an EEO complaint in "bad faith" can be fired on the basis of

---

[4] The Eighth Circuit appears to have both accepted *and* rejected the *Pettway* rule. *Compare Womack v. Munson*, 619 F.2d 1292, 1298–99 (8th Cir. 1980) (following *Pettway*) *with Gilooly v. Missouri Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005) (seeming to reject *Pettway*), *and id.* at 742 (Colloton, J., concurring in part and dissenting in part) (interpreting the panel majority to reject *Pettway*). *See Hatmaker*, 619 F.3d at 746 (describing *Womack* and *Gilooly* as "inconsistent" with one another).

12

that complaint. Under such a rule, FEMA might be able to argue that Egei's termination was consistent with Title VII. The remaining circuits—including this circuit—have not definitively resolved the question but have either expressed approval of the *Pettway* rule in passing, *see, e.g., Parker*, 652 F.2d at 1019, or observed that the protection afforded by the participation clause is "expansive," *see, e.g., Slagle*, 435 F.3d at 266; *Clover*, 176 F.3d at 1353.

**B.    The Court's View**

Because the D.C. Circuit has yet to resolve definitively whether Title VII's participation clause shields an employee from retaliation on the basis of false or malicious statements made during EEO proceedings, the Court must come to its own conclusion. For the following reasons, the Court agrees with the Fourth and Fifth Circuits that it does.

First, although the D.C. Circuit has not definitively resolved the question, its opinion in *Parker* offers relevant guidance. In *Parker*, a white railroad worker filed a Title VII action against his employer, alleging that its affirmative action plan violated his rights under the statute. 652 F.2d at 1013. When the worker attempted to file an amended complaint, alleging that he had been retaliated against on the basis of his opposition to the plan, the district court denied leave to amend. *Id.* at 1014. The D.C. Circuit reversed, explaining that the worker had acted on his "good faith, reasonable belief" that the affirmative action plan had violated the principles of Title VII, and that he was therefore protected from adverse action by the opposition clause. *Id.* at 1020. In doing so, however, the D.C. Circuit distinguished the opposition clause—which it held provided only qualified protection from retaliation—from the participation clause. *Id.* at 1019. The participation clause, the Court explained,

> speaks in clear, absolute terms, and has accordingly been interpreted as shielding recourse to the EEOC, regardless of the ultimate resolution of the underlying claim on its merits. *See, e.g.*, *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969). . . .

13

> The obvious concern of Congress, in both the opposition and participation clauses, was to protect the employee who dares to speak out against his employer's hiring practices. The enforcement scheme Congress chose for Title VII relies heavily on the initiative of aggrieved employees, whose efforts in the public interest would be severely chilled if they bore the risk of discharge whenever they were unable to establish conclusively the merits of their claims.

*Id.* Thus, although the D.C. Circuit did not explicitly adopt the *Pettway* rule, it cited favorably to *Pettway* and relied on essentially the same reasoning that the Fifth Circuit did in that case. There is at least some indication, in other words, that the D.C. Circuit would—were it to resolve the question—follow the Fifth Circuit's decision in *Pettway*.

Second, the text of the participation clause itself militates in favor of protection for the substance of statements made in the course of EEO proceedings, even if false or malicious. As then-Chief Judge Wilkinson observed, the participation clause forbids retaliation against an employee who "has made a charge, testified, assisted, or participated *in any manner*" in a protected proceeding. 42 U.S.C. § 2000e-3(a) (emphasis added); *Glover*, 170 F.3d at 414. "A straightforward reading of the statute's unrestrictive language leads inexorably to the conclusion that all testimony in a Title VII proceeding"—or at least the *substance* of such testimony—"is protected against punitive employer action." *Glover*, 170 F.3d at 414. The Seventh Circuit's contrary view is not premised on the language of statute, but on a disbelief that Congress could possibly have intended to protect "[l]ying in an internal investigation." *Hatmaker*, 619 F.3d at 746.

Third, as most courts to have considered this issue have agreed, a broad protection is consistent with the remedial purpose of Title VII's antiretaliation provisions in general and the participation clause in particular. "Activities under the participation clause are essential to the machinery set up by Title VII." *Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 259 n.4 (4th Cir. 1998) (internal quotation marks omitted). Those activities would be chilled,

and Title VII's scheme frustrated, if employees "bore the risk of discharge whenever they were unable to establish conclusively the merits of their claims." *Parker*, 652 F.2d at 1019; *see Pettway*, 411 F.2d at 1005 ("A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith."). If an employee can file an EEO complaint, lose on the merits, and then be fired for making false accusations—just as Egei was here—it is not difficult to imagine future employees hesitating to raise *bona fide* discrimination claims that they are uncertain they will win. *Cf. Pettway*, 411 F.2d at 1005 ("This is often the only way that such issues can be raised—by an individual drafting his charge as best he can without expert legal advice.").

A good-faith but mistaken claim of discrimination, of course, is not the same as a *false* claim of discrimination, and those judges who have rejected the *Pettway* rule have emphasized that the two can be distinguished. *See Mattson*, 359 F.3d at 892 ("Protection is not lost simply because an employee is mistaken on the merits of his or her charge."); *Gilooly*, 421 F.3d at 740 (to similar effect). This might be true in a case where an employee admits to having lied. But absent such an admission, the risk of chilling legitimate claims and testimony remains. It would be cold comfort for claimants if they were nominally protected from adverse action on the basis of their testimony, but only to the extent that a judge, an ALJ, or even an employer concludes in "good faith" that such testimony was false or malicious. *Cf. Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). Indeed, it is not difficult to imagine circumstances where an employer might believe in good faith that a charge was false—a senior manager, for example, might (mistakenly) believe that it is unfathomable that a long-serving and respected mid-level manager would have engaged in the discriminatory conduct alleged by the employee—and on that basis discharge an employee for asserting a charge that was, in fact, true.

15

Fourth, and finally, affording broad protection to an employee's EEO complaints—even if malicious or untrue—is consistent with protections afforded complainants in other legal regimes. It is black-letter tort law, for instance, that parties, attorneys, and witnesses in a judicial proceeding are absolutely privileged to make defamatory statements during the course of that proceeding. *See* Restatement (Second) of Torts §§ 586–88 (1977 & Supp. 2016). That rule, like this one, is designed to protect access to legal remedies. *See id.* § 587 cmt. a ("The privilege stated in this Section is based upon the public interest in according to all men the utmost freedom of access to the courts of justice for the settlement of their private disputes."). This is not to condone lying or to suggest that false charges and testimony do not take a toll on administrative proceedings. The problem is that, in practice, it is not possible to permit employers to take adverse action against EEO claimants based on false charges or testimony—or based on charges and testimony that the employer *believes* to be false—without chilling truthful charges and testimony.

The Court acknowledges that there are reasonable arguments on either side of this issue. *See, e.g.*, *Gilooly*, 421 F.3d at 740 ("Differentiating individual cases between the two extremes is a difficult endeavor . . . ."); *Proulx v. Citibank, N.A.*, 659 F. Supp. 972, 977 (S.D.N.Y. 1987) ("Whichever interpretation is adopted, a potential for abuse arises."). But there is no evidence that the interpretation the Court adopts today is more likely to *increase* the kinds of abuses contemplated by the courts that have rejected the *Pettway* rule, *cf. Mattson*, 359 F.3d at 890–91 (positing an employee who "assure[s] himself unlimited tenure by filing continuous complaints with the government agency [because] he fears that his employer will discover his duplicitous behavior at the workplace"), than it is to *decrease* the chill on legitimate claims—which is, after all, the risk that Congress sought to minimize. And nothing in the Court's interpretation of Title

16

VII prohibits an employer from taking action against an employee for improper behavior *outside* the scope of EEO proceedings. *See, e.g.*, *Glover*, 170 F.3d at 414 ("Our holding does not permit employees to immunize improper behavior simply by filing an EEOC complaint.").

Finally, the Court emphasizes three limitations on the breadth of its holding. First, the principles discussed above apply primarily to a case, like this one, in which an employer takes adverse action against an employee on the basis of the *substance* of her EEO claim or testimony offered in support of that claim—that is, on the ground that the employer believes that the charge or testimony itself is false or malicious. The Court is not confronted with a case, for instance, in which a federal employee maliciously divulges trade secrets on the public record in a Title VII action, *see*, *e.g*., 18 U.S.C. § 1905, or threatens another participant during the course of an EEO proceeding, *see*, *e.g*., 18 U.S.C. § 1512. The question whether an employer could take adverse action in response to misconduct unrelated to the content of the employee's charge or testimony is not before the Court. Second, this is not a case in which an employee has admitted having made a false or malicious statement in the course of an EEO proceeding. The question whether such an admission would render a false or malicious statement actionable under Title VII, once again, is not before the Court; the question before the Court is simply whether an employer may punish an employee for offering testimony in an EEO proceeding that the employee asserts is true and that the employer disbelieves. Third, the Court's holding is limited to adverse action cognizable under Title VII's antiretaliation provision—that is, adverse *employment* action. It leave for another day the question whether and under what circumstances a court, an ALJ, or some other party might independently take action in response to false or malicious testimony.

In sum, the Court concludes, consistent with *Pettway*, *Glover*, and the *Parker* dicta, that Title VII's participation clause protects an employee from adverse employment action taken on

17

the basis of the substance of a charge or testimony she makes in the course of her participation in Title VII EEO proceedings.

**C.     This Case**

This rule leaves little, if anything, to FEMA's defense. FEMA acknowledges that it fired Egei because of substantive statements she made during her initial EEO proceedings. Indeed, the fundamental premise of FEMA's argument is that it fired Egei because of her *statements*, not because she chose to avail herself of the EEO process. *See* Dkt. 9-1 at 21 ("There is no dispute that her false statements occurred during her prior EEO proceeding, but that link alone does not suffice to show pretext."). Because those statements were protected by Title VII, however— whether or not they were false or malicious—FEMA was not permitted to fire Egei for making them.

In its order soliciting supplemental briefing, the Court asked FEMA whether any further defenses were available to it or whether, instead, summary judgment should be entered for Egei. Dkt. 18 at 2. FEMA suggests three reasons why the Court should not enter summary judgment for Egei at this time. First, FEMA argues that it is entitled to discovery as to whether "there is evidence of a lack of good faith, of outright fraud, or of other relevant misconduct" on Egei's part. Dkt. 19 at 10. The problem for FEMA is that the relevant question under Title VII is not whether Egei *could* have been terminated on the basis of "other . . . misconduct," but whether she *was*. The record amply refutes any suggestion that she was. And to the extent that FEMA argues that some evidence might further support its claim that Egei did not pursue her EEO claim in "good faith," or that her claim was an act of "outright fraud," its argument is beside the point. At least in the absence of a concession *from Egei* that she was lying—a fact Egei vigorously

18

contests, *see* Compl. ¶ 15—the weight of the evidence in support of FEMA's view (and against Egei's) does not matter.

FEMA's other arguments are also unavailing. FEMA's second argument as to why the Court should not grant summary judgment to Egei is that it is entitled to discovery related to the issue of damages. Dkt. 19 at 10. The Court agrees, and thus will limit the judgment to the issue of liability, not damages. FEMA finally argues that Egei cannot recover because "the equitable relief she seeks is barred by her unclean hands." *See id.* (citing *Precision Instrument Mfg. Co. v. Auto Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945)). But to the extent FEMA contends that Egei's allegedly malicious and false charges and testimony give rise to an equitable defense at the *liability* phase, that argument merely rehashes the contention discussed and rejected above. And, to the extent FEMA argues that equitable considerations bear on the appropriate *remedy,* that argument is premature.

## CONCLUSION

For these reasons, the Court will deny FEMA's motion to dismiss and/or for summary judgment, Dkt. 9, and will grant partial summary judgment to Egei, limited to the question of liability. A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: June 24, 2016